

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the order of the Court.**

**Signed January 5, 2006**

_Barbara J. Houser_

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| THE HERITAGE ORGANIZATION, L.L.C., | § | CASE NO. 04-35574-BJH-11 |
| | § | (Chapter 11) |
| Debtor. | § | |
| | § | |
| DENNIS S. FAULKNER, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| W. RALPH CANADA, JR., | § | ADVERSARY NO. 04-3338 |
| | § | |
| Defendant, | § | |
| | § | |
| v. | § | |
| | § | |
| GARY M. KORNMAN, | § | |
| | § | |
| Third-Party Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

The Court tried the remaining issues to be determined in this adversary

proceeding, as identified in the Court's Memorandum Opinion and Order dated March 8,

2005 (the "Prior Order"),[1] on September 9 and 12, October 11 and 12, and November 9 and 21, 2005. Having reviewed the parties' respective pleadings, and having considered the evidence and the arguments of counsel, the Court issues this Memorandum Opinion and Order, which contains its findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

## I.  Procedural Background and Jurisdiction

On May 17, 2004 (the "Petition Date"), The Heritage Organization, L.L.C. (the "Debtor") filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, thereby initiating Case No. 04-35574 with this Court (the "Bankruptcy Case"). On June 16, 2004, this adversary proceeding was initiated by W. Ralph Canada, Jr.'s ("Canada") removal of a lawsuit styled *The Heritage Organization, L.L.C. v. W. Ralph Canada, Jr. v. Gary M. Kornman* (Cause No. 03-00426-K pending in the 192nd District Court of Dallas County, Texas – the "State Court Lawsuit) to this Court. The State Court Lawsuit is related to a prepetition arbitration proceeding between Canada, on the one hand, and the Debtor and Gary Kornman ("Kornman"), the Debtor's Chief Executive Officer, on the other (the "Arbitration").

On July 22, 2004, Canada filed a proof of claim in the Bankruptcy Case (Claim No. 10) (the "Canada POC"), thereby asserting an unsecured, non-priority claim against the Debtor in the amount of $6,161,270.08 (the "Canada Claim"). *See* Joint Ex. 28. The Canada Claim is premised upon an arbitration award issued in the Arbitration.

On August 13, 2004, the Court entered an Order directing the United States Trustee to appoint a Chapter 11 trustee for the Debtor. On August 16, 2004, Dennis S.

---

[1] *See* Docket # 62, the Honorable Steven A. Felsenthal presiding. Upon Judge Felsenthal's resignation from the bench, the undersigned judge was assigned the Debtor's bankruptcy case and all related adversary proceedings.

Faulkner was appointed to serve as the Chapter 11 trustee (the "Trustee"), which appointment was approved by Order entered on August 18, 2004.  On September 9, 2004, the Court signed an Order permitting the Trustee to be substituted in the Debtor's place in this adversary proceeding.

On October 26, 2004, GMK Family Holdings, LLC ("GMK Holdings") filed an objection to the Canada Claim (the "Claim Objection").  On November 1, 2004, the Debtor joined in the Claim Objection (the "Debtor's Joinder").

On November 5, 2004, the Court conducted a scheduling conference with the parties, at which time they consented to the consolidation of this adversary proceeding and the Claim Objection for further disposition and trial due to the overlap of issues between the two proceedings.  In accordance with such ruling, the Canada POC, the Claim Objection, and the Debtor's Joinder were docketed in this adversary proceeding. On July 26, 2005, the Trustee filed the Trustee's Statement of Position on Remaining Issues for Determination, and Joinder in Objection to Canada Claim Pursuant to 11 U.S.C. § 502(b)(4) (the "Trustee's Joinder").[2]

The Court exercises subject matter jurisdiction over this adversary proceeding and the Claim Objection pursuant to 28 U.S.C. §§ 157 and 1334.  The adversary proceeding and the Claim Objection constitute core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B) and (O).  Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## II.     Issues Subject to Determination

As set forth in the Prior Order, the issues to be determined are: (1) whether, and to what extent, the Canada Claim is subject to disallowance pursuant to § 502(b)(4) of the Bankruptcy Code, (2) the amount of attorneys' fees and expenses that should have been

---

[2] GMK Holdings, the Debtor, and the Trustee will be referred to collectively as the "Objectors."

awarded to the Debtor in connection with the Arbitration, with such fees and expenses being applied as an offset to the allowed amount of the Canada Claim; and (3) the amount of arbitration costs and expenses that should have been assessed against Canada in connection with the Arbitration but which, instead, were assessed against and paid by the Debtor, with such costs and expenses being applied as an offset to the allowed amount of the Canada Claim.

## III.    Factual Background

The Debtor is a Delaware limited liability company founded by Kornman. Kornman served as the Debtor's Chief Executive Officer at all times relevant to these proceedings. The Debtor's managing member is GMK Holdings.

Prior to the Petition Date, the Debtor's operations consisted of providing services related to wealth, estate, and tax planning to extremely high net-worth individuals. However, those services were not legal services, as the Debtor's agreements with its clients expressly provided. *See, e.g.*, Canada Ex. 60 at § 5.2.

When the Debtor was operating, it organized its employees into several departments. For example, the Debtor's research department was responsible for identifying possible clients for the Debtor's services. Employees of the Debtor who worked in the research department conducted in-depth background research on possible clients and compiled pertinent information within an extensive database. Once sufficient information had been gathered on a potential client by the research department, the information would be passed on to certain other Debtor employees identified within the company as "initiators." The initiators were responsible for initiating contact with the potential client in an effort to set up an introductory meeting. If successful, the Debtor's

"contractors" would then get involved. The contractors were responsible for introducing the Debtor's business to the potential client in an effort to set the stage for a meeting with one of the Debtor's "principals." Finally, one or more of the principals would then meet with the potential client to finalize the agreement, present applicable strategies to the client, and, if the client decided to implement one or more of the strategies, work with the client and the client's advisors in implementing the strategies.

## A.      Canada's Employment with the Debtor

Canada, a licensed attorney in the State of Texas who graduated from Harvard Law School in 1979, is a former employee of the Debtor. Canada was first introduced to Kornman prior to the time of the Debtor's formation. In particular, while employed by various law firms, Canada provided legal services to certain businesses affiliated with Kornman. In late 1994, Kornman recruited Canada to go to work for one of such businesses, The Heritage Organization, Inc. ("THO Inc.").

Thereafter, the Debtor was formally organized. And, on or about March 1, 1995, Canada went to work for the Debtor pursuant to the terms of an employment agreement (the "Employment Agreement"). *See* Trustee Ex. 3.

Prior to joining the Debtor, Canada did not have any expertise in estate planning or tax law, and he had never advised any clients on the income tax treatment of transactions. Additionally, while Canada had some level of marketing experience – *i.e.*, marketing himself and/or his law firms' services, he did not consider himself to be a salesman prior to his employment with the Debtor. Moreover, when Canada joined the Debtor, Canada did not bring any relationships with him that developed into business for the Debtor.

Consequently, Canada's first task as an employee of the Debtor was to learn about the Debtor's business, its various estate and tax planning strategies, and its method of marketing. In large part, Canada gained experience in these areas by traveling with Kornman to client meetings and by assisting Kornman on various client projects. Once sufficiently trained and knowledgeable, Canada began to work on certain client engagements as a principal independently from Kornman. After a period of time, Canada was named President and Chief Operating Officer of the Debtor, with Kornman serving as the Debtor's Chief Executive Officer. Canada never held an equity interest in the Debtor.

Canada tendered his resignation to Kornman in December 1998, after a dispute arose over his compensation. *See* Joint Ex. 8. In order to persuade Canada to remain with the Debtor, Kornman agreed to increase Canada's compensation. On client engagements that Canada worked on with Kornman, Kornman agreed that the Debtor would pay Canada 10% of the revenues generated from the client if Canada was involved prior to the client signing an agreement with the Debtor. On client engagements that Canada handled without Kornman's active involvement, Kornman agreed that the Debtor would pay Canada 20% of the revenues generated from the client. And, on client engagements that Canada worked on after the client had signed an agreement with the Debtor – *i.e.*, Canada only assisted in implementation of the strategies – Canada was to receive 1% of the revenues generated from the client. However, there were no "implementation only" cases.

In 2001, a further dispute arose between Canada and Kornman over Canada's level of compensation. As explained more fully below, this dispute ultimately

culminated in the filing of an arbitration demand by Canada against the Debtor and Kornman in accordance with the Employment Agreement. In July 2002, Canada's employment with the Debtor ended.

Between January 1997 and August 2002, the Debtor paid Canada: (i) salary and bonuses of about $4.9 million, and (ii) non-compete payments, as required by § 4.1 of the Employment Agreement, in excess of $1.0 million, for total payments to Canada of slightly in excess of $6.0 million. *See* Trustee Exs. 3, 11. During that same period of time, the Debtor's revenues from cases Canada worked on exceeded $130 million. *See* Canada Ex. 145A.

**B.     The Arbitration and Arbitration Award**

As noted previously, in early July 2002, Canada filed an arbitration demand against the Debtor and Kornman. In the Arbitration, Canada claimed, among other things, that the Debtor had taken certain excess deductions in relation to Canada's compensation and had failed to honor an oral promise to pay Canada fifteen percent (15%) of the income generated from the Debtor's agreement with the "Connecticut Client."[3] In relation to Canada's claims against Kornman, Canada asserted that Kornman was an "Affiliate" of the Debtor, as defined in § 1.2(a) of the Employment Agreement, making him personally liable to Canada under the terms of that agreement. *See* Joint Ex. 14 at pp. 3, 15.

On or about April 14, 2004, following the trial in the Arbitration, the arbitrators issued their Award of Arbitrators (the "Arbitration Award"). *See* Trustee Ex. 2. Pursuant to the Arbitration Award, Canada was awarded: (1) $114,000 in damages plus

---

[3] Pursuant to the Debtor's agreement with the "Connecticut Client," the Debtor agreed to keep such client's name confidential. In order to honor such agreement, the parties have simply referred to the client as the "Connecticut Client." The Court likewise does so herein.

prejudgment interest of $67,502.95 (for a total of $181,502.95) on his excess deductions claim (the "Excess Deductions Award"), (2) $3,413,676.93 in damages plus prejudgment interest of $1,680,090.20 (for a total of $5,093,767.13) on his oral agreement claim (relating to the Connecticut Client engagement) (the "Extra Compensation Amount"), and (3) $886,000.00 in attorneys' fees which, combined with the above-referenced amounts, brought the total award to $6,161,270.08, the same amount as set forth in the Canada POC.

### C. The Work Underlying the Extra Services Component of the Canada Claim

As noted previously, the Canada Claim is premised upon services rendered by Canada to the Debtor, together with interest on the amounts due for such services and attorneys fees incurred in enforcing the Employment Agreement. And, as noted previously, the Extra Compensation Amount is premised upon services rendered by Canada in connection with the Connecticut Client engagement and prejudgment interest on the amount of the value of those services as found by the arbitrators. But, for analytical purposes here, the Extra Compensation Amount must be broken down into its two component parts: (1) the amount due for Canada's services in connection with the Connecticut Client as found by the arbitrators, $3,413,676.93, (the "Extra Services Component") and (2) prejudgment interest on the Extra Services Component in the amount of $1,680,090.20 as awarded by the arbitrators (the "Interest Component").

Between 2000 and 2001, the Connecticut Client engagement generated approximately $29.2 million in gross revenues for the Debtor. *See* Joint Ex. 12. And, between 2000 and 2001, the Debtor paid Canada in excess of $2.9 million in salary and

bonuses.[4]  *See* Trustee Ex. 11.  However, of that $2.9 million, Canada received "something just north of $750,000" in connection with the Connecticut Client engagement.  10/12 Tr. at 200, 17-19.[5]

Canada was not involved in either the identification of the Connecticut Client as a possible client for the Debtor or the Debtor's early efforts to solicit the Connecticut Client as a prospective client of the Debtor (jobs performed by the Debtor's research department, the so-called "initiators," and the so-called "contractors," initially, and then Kornman once the Connecticut Client had agreed to meet with a "principal").  However, as of late August 2000, the Debtor's efforts to sign the Connecticut Client to an agreement with the Debtor were unsuccessful.  And, Kornman was not optimistic about the Debtor's chances of signing the Connecticut Client, putting the Debtor's chances of signing that client at about 1%.

Another meeting was scheduled with the Connecticut Client for August 28, 2000. Because Kornman thought the Debtor's chances of signing the Connecticut Client would be improved if he strengthened the Debtor's presentation team, Kornman asked the Debtor's other two principals, Canada and Anthony Bird ("Bird"), to join him at that meeting.  9/12 Tr. at 551, 20-25; 555, 10-13.  Canada successfully claimed in the Arbitration that it was in connection with this request for Canada's participation in the August 28 meeting that Kornman orally agreed to pay Canada 15% of the income generated from signing the Connecticut Client.

---

[4] During this same period of time, the Debtor also paid Canada an additional $504,000.00 in non-compete payments.  *See* Trustee Ex. 11.
[5] In this Memorandum Opinion and Order, the Court cites trial testimony by identifying the transcript date, then the page of the transcript, followed by the line references.  So, this cite is to testimony by Frank Portnoy on October 12, 2005 at page 200, lines 17-19.

Canada agreed to become involved, and he participated in the August 28, 2000 meeting with the Connecticut Client, along with Kornman, Bird, and Tim Seaberg ("Seaberg"). Canada also participated in several follow-up meetings with the Connecticut Client and/or his counsel. And, on or about October 17, 2000, after numerous meetings and much negotiation, the Connecticut Client entered into an agreement with the Debtor pursuant to which the Debtor agreed to communicate one or more tax savings strategies to the Connecticut Client. *See* Canada Ex. 60. Canada signed that agreement on the Debtor's behalf as its President and "an authorized officer." *Id*. at p. 10.

Canada does not claim to have procured the Connecticut Client engagement single-handedly. While he believes he played a significant role in getting the Connecticut Client to sign an agreement with the Debtor, Canada acknowledges that it was a joint effort by several Debtor employees, including Kornman, Bird, Seaberg, and him.

After the Connecticut Client signed an agreement with the Debtor in October 2000, the Debtor communicated various tax savings strategies to the Connecticut Client. The Connecticut Client ultimately determined to implement certain of the Debtor's tax savings strategies. Canada was actively involved in the Connecticut Client's implementation process, which was largely completed by the end of December 2000. *See, e.g.*, Canada Ex. 71. Of the Debtor's three principals – Kornman, Canada, and Bird, Canada was the key principal involved in the implementation process. And, while the transactional documents utilized in implementing the Debtor's strategies were prepared by the Connecticut Client's legal counsel – *i.e.*, the Lewis, Rice & Fingersh, L.C. law firm, they were reviewed by Canada and/or the other Debtor employees who were

involved in the implementation process. Canada's involvement in the Connecticut Client engagement spanned a period of about six months, with the bulk of his time having been spent between October and December 2000. In sum, Canada played a key role in getting the Connecticut Client to sign an agreement with the Debtor, and then he played a key role in the Connecticut Client's implementation of the Debtor's strategies.

## IV. Legal Analysis

### A. Section 502(b)(4)'s Applicability Here

Section 502(b)(4) of the Bankruptcy Code provides that a claim for services of an insider or attorney of a debtor shall not be allowed to the extent that "such claim exceeds the reasonable value of such services." 11 U.S.C. § 502(b)(4). Thus, by its terms, § 502(b)(4) only comes into play where the claim is one asserted by an insider or attorney, and is for services provided to the debtor.

Accordingly, the Court must first decide if Canada was an "insider" of the Debtor. If the debtor is a corporation, the Bankruptcy Code defines "insider" to include an officer of a debtor or a person in control of the debtor. 11 U.S.C. § 101(31)(B)(ii), (iii). While the drafters of the Bankruptcy Code did not expressly address a limited liability company when considering the various forms of legal entities that might become a debtor, they did make the definition of insider flexible, by using the word "includes" as the predicate phrase. And, as provided in § 102(3) of the Bankruptcy Code, "[i]n this title, 'includes' and 'including' are not limiting." 11 U.S.C. § 102(3).

As the court noted in *In re Die Fliedermaus LLC*, 323 B.R. 101, 111 (Bankr. S.D.N.Y. 2005), "[c]ourts uniformly treat this definition of 'insider' as illustrative of types of insider relationships but not as exclusive, and instead refer to the definition of

insider contained in the legislative history: 'one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor.'"  Or, as stated by the court in *In re Allegheny Int'l, Inc.*, 158 B.R. 332, 339 (Bankr. W.D. Pa. 1992), "[c]ourts have construed the definition of an insider flexibly."  The determination of insider status is made as of the time the claimant provided services to the debtor.  *See In re Russell Cave Co.*, 253 B.R. 815, 821 (Bankr. E.D. Ky. 2000).

Although the Debtor is a limited liability company and not a corporation, that is a distinction without a difference for this purpose.  As the court concluded in *In re Barman*, 237 B.R. 342, 348 (Bankr. E.D. Mich. 1999), "a limited liability company . . . is sufficiently analogous to a corporation that for purposes of determining insiders, it is appropriate to consider the similar principles."  Moreover, as the Debtor's President at all times relevant to the Canada Claim, Canada had a sufficiently close relationship with the Debtor that he should be considered an insider of the Debtor for purposes of § 502(b)(4). *See* Canada Ex. 34 at § 7.06 (setting forth the duties of the Debtor's President and specifically providing that the President shall be in charge of the day-to-day management of the Debtor).

In coming to this conclusion, the Court rejects Canada's argument that he did not exercise the kind of control over the Debtor that § 502(b)(4) contemplates, and thus, he should not be considered an insider for purposes of § 502(b)(4).  While it is true that Canada did not exercise all of the control over the Debtor that a president of a company would normally enjoy,[6] the Code's definition of "insider" does not draw that fine a

---

[6] The evidence establishes, for example, that Canada did not have access to the Debtor's financial statements, documents that would normally be available to the president of a company.  However, because

distinction as it relates to a debtor's officers. Under the Code, an officer of a corporation is an insider as a matter of law. The fact that the Debtor is a limited liability company should not change this legal conclusion.

Next, the Court must decide if Canada was an attorney of the Debtor as the Objectors contend because the factors the Court must consider in determining the reasonableness of an attorney's claim for services are different.[7] While it is true that Canada is an attorney, the Court concludes that Canada was not an attorney of the debtor within the meaning of § 502(b)(4) because of the nature of Canada's role with respect to the Connecticut Client engagement. In short, Canada was not Heritage's attorney in connection with that business transaction. Rather, Canada assisted Kornman in selling the Debtor's tax savings strategies to the Connecticut Client, and then assisted the Connecticut Client in implementing those strategies. While Canada may have reviewed certain legal documents in connection with the Connecticut Client engagement, and may have assisted the Connecticut Client's lawyers in revising certain legal documents,

---

the Debtor was a private company whose Chief Executive Officer (Kornman) owned, indirectly, substantially all of the Debtor's equity, Kornman refused to allow Canada (and most other Debtor employees) access to the financial books and records of the Debtor. However, Canada was held out to clients as an officer of the Debtor – *i.e.*, its President – and he signed the Debtor's agreement with the Connecticut Client as its "President" and an "authorized officer." *See* Canada Ex. 60 at p. 10.

[7] The following factors, among others, would be considered in determining the reasonableness of an attorney's claim for services under § 502(b)(4): (1) the type and amount of work done in rendering the services; (2) the novelty and difficulty of the services rendered; (3) the skill requisite to performing the services properly; (4) the results accomplished; (5) whether the compensation was fixed or contingent; (6) the amount involved in connection with the services rendered; (7) the total amount of time expended in rendering the services; (8) the experience, reputation and ability of the attorney when the services were rendered; (9) the financial status and solvency of the debtor at the time that the claim arose; (10) the size of the debtor's estate; and (11) the nature of the claims pending against the debtor. *See, e.g.*, *In re Nelson*, 206 B.R. 869, 879 (Bankr. N.D. Ohio 1997); *see also In re First Colonial Corp. of America*, 544 F.2d 1291, 1298-99 (5th Cir. 1977). However, since the Court concludes that Canada was not providing legal services to the Debtor in connection with the Connecticut Client engagement, these factors are not controlling here. Accordingly, the expert testimony of Professor Portnoy regarding a lodestar calculation of a reasonable fee to Canada in connection with the Connecticut Client engagement is not useful. For the same reason, the Court does not find relevant the expert deposition testimony of James George, who testified to the lodestar factors and the standards applied in federal court to determine a reasonable attorney's fee in common fund and class action cases.

---

**Memorandum Opinion and Order**                                                            13

Canada did not need a law license to provide those services to the Debtor.[8] Rather, Canada testified that he needed a "Group 1" insurance license from the State of Texas and certain securities licenses to provide his services to the Debtor. 9/12 Tr. at 332, 1 – 333, 14. As Kornman (also a lawyer) admitted during the Arbitration, the fact that Canada was a lawyer was a "less important" factor in connection with his involvement in the Connecticut Client engagement "because we had other people to do that." 9/12 Tr. at 554, 19-20. Accordingly, the Court will not analyze the Extra Services Component of the Canada Claim under a traditional lodestar analysis applicable to attorney compensation generally.

As noted previously, § 502(b)(4) only comes into play where the claim is of an insider or attorney, and is for services provided to the debtor. Thus, because the Court has concluded that Canada was an insider of the Debtor, the Court must next decide if the Extra Services Component of the Canada Claim is based upon services provided to the Debtor, although this element of § 502(b)(4) does not appear to be in dispute here. In any event, the answer is yes.

The Arbitration was, at its core, an employee-employer dispute over the amount of compensation due to Canada for the services he provided to the Debtor under the Employment Agreement and in connection with the Connecticut Client. Therefore, this prong of § 502(b)(4) is also met. Accordingly, the Extra Services Component of the Canada Claim is subject to § 502(b)(4)'s requirements and must be scrutinized for its reasonableness.

---

[8] Bird is not a lawyer and provided the same type of services to the Debtor in connection with client engagements.

**B.      Reasonableness of the Extra Services Component of the Canada Claim**

At the outset of the Court's analysis, it is important to understand the purpose of §

502(b)(4).  Section 502(b)(4) serves two objectives: (1) to prevent insiders of a debtor

from extracting inflated compensation from the debtor at the expense of the debtor's

creditors; and (2) to prevent over-generosity of a debtor prior to a bankruptcy filing.  *See*

*Allegheny Int'l*, 158 B.R. at 339 ("The purpose underlying 11 U.S.C. § 502(b)(4) is to

prevent officers and directors (insiders) of a debtor from extracting inflated amounts for

their services at the expense of the creditors") (citing *In re 268 Ltd.*, 789 F.2d 674, 677

(9th Cir. 1986)); 4 *Collier on Bankruptcy* ¶ 502.03[5][c], at 502-36 (Lawrence P. King, *et*

*al.*, eds., 15th ed. rev. 2005) ("Section 502(b)(4) is designed to prevent overreaching by an

insider or an attorney, or over-generosity by a debtor with his or her assets prior to the

filing of a petition").

In analyzing the reasonableness of a claim for services under § 502(b)(4), a court

should consider the totality of the circumstances involved at the time that the services

were rendered.  *See, e.g., In re Gutierrez*, 309 B.R. 488, 493 (Bankr. W.D. Tex. 2004); *In*

*re Nelson*, 206 B.R. at 882.  While the reasonableness of a claim for services may

ordinarily be determinable under state law standards outside of bankruptcy, "a federal

standard should guide the court in its judgment regarding the reasonableness of [a claim

subject to Section 502(b)(4)'s provisions] in the context of bankruptcy."  *Landsing*

*Diversified Properties-II v. First Nat'l Bank & Trust Co. (In re Western Real Estate*

*Fund, Inc.)*, 922 F.2d 592, 597 (10th Cir. 1990), *modified on other grounds*, 932 F.2d 898

(10th Cir. 1991).  The burden of proof on reasonableness under § 502(b)(4) ultimately lies

with the insider.  *See Russell Cave*, 253 B.R. at 822; *In re All-American Auxiliary Ass'n*,

95 B.R. 540, 545 (Bankr. S.D. Ohio 1989); *In re Koontz Aviation, Inc.*, 71 B.R. 608, 610 (Bankr. D. Kan. 1987).

After considering the totality of the circumstances present here, and for the reasons explained more fully below, the Court concludes that Canada has satisfied his burden of proof and has established that the Extra Services Component of his claim is reasonable in light of the services he provided to the Debtor in connection with the Connecticut Client. Accordingly, the Canada Claim[9] is allowable, subject to certain setoffs discussed below.

The starting point in the Court's analysis is the agreement to pay the Extra Services Component of the Canada Claim, as found by the arbitrators in the Arbitration. The Court concludes that the fact an agreement was found to exist by the arbitrators after a contentious arbitration proceeding constitutes some evidence of the reasonableness of that agreement. Here, as the Debtor's Chief Executive Officer, Kornman exercised complete control over the amount of compensation paid to the Debtor's employees, including Canada, whether in the form of salary, non-compete payments, and/or bonuses. There is no reason to believe that Kornman is anything but an extremely successful and sophisticated businessman.[10] While Kornman vigorously denied the existence of an oral

---

[9] The Objectors do not object under § 502(b)(4) to either (1) the reasonableness of the *amount* of attorney fees awarded to Canada in the Arbitration or (2) the Excess Deductions Award. While the Objectors do object under § 502(b)(4) to the Extra Compensation Amount of the Canada Claim in its entirety (including the Interest Component), the Court concludes that the Interest Component is not subject to § 502(b)(4)'s reasonableness requirement because it is not a claim for "services." Rather, the Interest Component represents compensation to Canada for the Debtor's delay in paying for his services in connection with the Connecticut Client engagement. *Cf.* 11 U.S.C. § 502(b)(2) (disallowing only *unmatured* interest and, by negative implication, allowing in full matured interest). Accordingly, so long as the Extra Services Component of the Canada Claim is allowable, the Interest Component is similarly allowable. However, if the Court were to disallow some portion of the Extra Services Component, then the Interest Component would have to be recalculated on the lesser amount allowed. That is different, however, than subjecting the Interest Component to a reasonableness requirement under § 502(b)(4), as the Objectors have implicitly contended here.

[10] Kornman refused to testify during these proceedings, in accordance with his 5th Amendment rights.

---

agreement to pay Canada 15% of the revenues generated from the Connecticut Client engagement,[11] a distinguished panel of arbitrators[12] disagreed, finding that Kornman had made such an agreement with Canada.

There is no evidence to suggest that the agreed-upon compensation represented an unreasonable amount of compensation when the agreement was reached. In fact, the agreed-upon 15% falls within the range of compensation Canada routinely received from the Debtor. It is undisputed that Canada routinely received 10% of the revenues generated on client engagements he worked on jointly with Kornman and 20% of the revenues generated from client engagements he handled himself. The 15% that the arbitrators found Kornman to have offered to Canada in connection with the Connecticut Client, and Canada to have accepted, falls within the range of compensation that Canada was routinely paid.

However, recognizing the distinction between the fact that an agreement exists and the reasonableness of the agreed-upon compensation, the Court concludes that the Extra Services Component of the Canada Claim represents reasonable compensation to Canada for the services he provided to the Debtor in connection with the Connecticut Client engagement for at least two additional reasons. First, while the amounts to be paid to Canada for the Connecticut Client engagement are substantial – the $750,000 already paid and the Extra Services Component at issue here – the fees generated from the Connecticut Client engagement are equally substantial. The Connecticut Client paid in excess of $29 million in fees to the Debtor in 2000 and 2001 for its tax savings

---

[11] Instead, Kornman testified in the Arbitration that he had agreed to pay Canada 15% of his normal 20% commission, or a total of 3% of the fees generated from the Connecticut Client. Kornman fully participated in the Arbitration.

[12] The arbitration panel consisted of the Honorable Robert Parker, retired Fifth Circuit Judge, former Texas Supreme Court Justice Deborah Hankinson, and former State Court District Judge Glen Ashworth.

strategies.[13]   The amount claimed by Canada is reasonable in relation to the amount of fees the Debtor received from the Connecticut Client.

Second, the Debtor's business structure when operating was unique.   The Debtor was a private company with very few senior management level employees – in essence only two – Kornman and Canada.[14]   Although Kornman did not testify, the Court's impression of him from the testimony of the other witnesses is that he was a "big picture" person, not someone who was particularly interested in the details of the business transactions.   Rather, Canada was the detail person in their business relationship, along with certain of the Debtor's mid-level employees.   The Extra Services Component of the Canada Claim represents a reasonable level of compensation for the Debtor's second most valuable employee, given his significant involvement, and the significance of his involvement, in a business transaction generating in excess of $29 million in fees for the Debtor.

Finally, although of little significance in light of the Court's finding that the Extra Services Component of the Canada Claim represents reasonable compensation to Canada in connection with his services on the Connecticut Client engagement, the policy behind § 502(b)(4) is not offended by allowing the Extra Services Component of the Canada Claim.   As noted previously, "[t]he purpose underlying 11 U.S.C. § 502(b)(4) is to prevent officers and directors (insiders) of a debtor from extracting inflated amounts for their services at the expense of the creditors," *Allegheny Int'l*, 158 B.R. at 339, or "to

---

[13] This $29.2 million represents roughly 2/3rds of the agreed upon fee.  Canada contends that the final 1/3[rd] (another $15 million) is due from the Connecticut Client.  *See* Canada Ex. 114.  And, Canada testified that the approximate $45 million fee agreed to in connection with the Connecticut Client engagement was a specially negotiated fee that was about half of the Debtor's regular fee.  9/9 Tr. at 101, 23 – 102, 15.

[14] While Bird was denoted a "principal" of the Debtor, he was clearly a lesser principal who handled client engagements that neither Kornman nor Canada were interested in handling.

prevent . . . over-generosity by a debtor with his or her assets prior to the filing of a petition." 4 *Collier on Bankruptcy* ¶ 502.03[5][c], at 502-36. There is no evidence to suggest that Canada "overreached" in connection with the Extra Services Component of the Canada Claim. The undisputed evidence[15] is that Kornman offered Canada 15% of the revenues generated from the Connecticut Client, and that Canada accepted Kornman's offer.

Nor did Canada attempt to extract the Extra Services Component of his claim from the Debtor at a time when the Debtor was experiencing financial difficulties. While the Debtor's profitability in 2000 (and 2001) would have been adversely affected if the Connecticut Client had not been signed, that is hardly surprising given the significant amount of fees the Connecticut Client paid to the Debtor that year(s).

Moreover, since the purpose behind § 502(b)(4) is to protect *creditors* from overreaching by insiders, or overpayments to insiders, the Court must consider whether any creditors were prejudiced by Kornman's agreement with Canada. In this regard the Court must ask, what creditors? And at what time must the creditors exist? At the time Kornman agreed to pay 15% of the revenues generated from the Connecticut Client to Canada, there is no evidence in the record to suggest that there were unpaid creditors or clients who had asserted claims against the Debtor arising from the Debtor's tax savings strategies. Moreover, there is no evidence to suggest that the Debtor thought itself to be either insolvent or in financial difficulties at that time.[16] In fact, in 2000 and 2001, the

---

[15] Again, while Kornman testified in connection with the Arbitration that he offered Canada 15% of Canada's normal 20% commission, or 3% of the revenues generated by the Connecticut Client engagement, the arbitrators found that Kornman agreed to pay Canada 15% of the revenues. Moreover, Canada's testimony here stands un-refuted that Kornman offered him 15% and that he accepted the amount offered, without any negotiation.

[16] Ironically, the Objectors seek to disallow the Extra Services Component of the Canada Claim under the guise of § 502(b)(4), when the timely payment of the Extra Services Component of the Canada Claim

Debtor realized net profits of approximately $10.5 million and $10.1 million, respectively. *See* Canada Exs. 19, 21. And, the Debtor continued to distribute millions of dollars to its shareholders, while successfully continuing its business operations. *See* Canada Ex. 145A.

In support of their current contention that the Extra Compensation Amount is unreasonable in relation to other creditors, the Objectors now point to the $183.5 million of unsecured client claims filed in the Bankruptcy Case. *See* Trustee Exs. 15, 16. And, according to the Objectors, in excess of $138.5 million of these claims have been asserted by clients for whom Canada was the Debtor's primary contact. *See* Trustee Exs. 17-29. According to the Objectors, even excluding ostensible duplicate claims, the total of these client claims exceeds $91.0 million.

These arguments overlook several points. First, at the time Kornman was found to have agreed to pay Canada 15% of the revenues generated by the Connecticut Client, there is no evidence in the record to suggest that any client had asserted any claims

---

would not be avoidable in the Bankruptcy Case. Stated another way, if Canada had received the Extra Services Component of his claim on a timely basis – *i.e.*, when it was earned in 2000 and 2001, the Trustee's sole remedy would be to attempt to recover the amounts paid as fraudulent transfers. And, because the monies would have been received outside the applicable look-back period under § 548 of the Bankruptcy Code, the Trustee's sole remedy would be based upon § 544(b)(1) of the Bankruptcy Code and applicable non-bankruptcy law. The Employment Agreement is governed by Texas law. *See* Trustee Ex. 3, §10.18. Under the Texas version of the Uniform Fraudulent Transfer Act, a transfer is avoidable, as relevant here, if the Debtor failed to receive reasonably equivalent value in exchange for the transfer and (i) was engaged or was about to engage in a business or transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction, or the Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur debts beyond its ability to pay, *see* Tex. Bus. & Com. Code Ann. § 24.005 (Vernon 2002); or (ii) the Debtor was insolvent or was rendered insolvent by the transfer. Tex. Bus. & Com. Code § 24.006 (Vernon 2002). There is no evidence in this case that the Debtor had unreasonably small capital in relation to its transactions or that it was incurring debt beyond its ability to pay. Further, the evidence shows that the Debtor was not insolvent in 2000 and/or 2001, and would not have been rendered insolvent in those years by the payment of the Extra Services Component of the Canada Claim. Therefore, the Trustee could not have avoided the payment of the amounts found owing in the Arbitration had it been timely made.

**Memorandum Opinion and Order**                                                                            20

against the Debtor arising from the Debtor's tax savings strategies.[17]  Moreover, the Objectors have objected to the allowance of these client claims based, among other things, upon contractual limitations contained in the client agreements.  *See* Joint Exs. 55-92.  If the Objectors' claim objections are sustained, substantially all of the claims filed in the Bankruptcy Case will be disallowed.  As counsel for the Trustee admitted at trial, the only significant claims that will remain to be paid in the Bankruptcy Case are the Canada Claim and the claims asserted by other businesses affiliated with Kornman.[18]

While the Court has not ruled on the objections to the client claims, and expresses no view here regarding the merits of the client claims, two further observations are appropriate.  First, assuming that the Objectors' objections to the client claims are sustained, leaving, in essence, the Canada Claim and the claims of the Kornman-affiliated entities to be paid in the Bankruptcy Case, it would be inappropriate to use § 502(b)(4) to protect Kornman-affiliated creditors from Kornman's agreement with Canada.[19]  Stated another way, Canada should not be deprived of his agreed-upon compensation when the only beneficiaries of § 502(b)(4)'s potential limitation on the Extra Services Component of the Canada Claim are other entities controlled by Kornman – either as unsecured creditors or interest holders.  In short, Kornman had his day in court – and lost.  The

---

[17] While the Objectors now point to the proofs of claim filed by clients in the Bankruptcy Case for services provided to them during 1999-2001, there is no evidence in the record to suggest that any former clients of the Debtor had asserted claims arising from the Debtor's tax savings strategies at the time of Kornman's agreement with Canada.  These client claims appear to have arisen when notice of the Bankruptcy Case was given and creditors were told of the bar date by which all claims must be asserted or barred.

[18] In addition to the client claims and the claims of the Kornman-affiliated creditors, there are several secured claims asserted by local taxing authorities in relatively small amounts, *see, e.g.*, Trustee Ex. 15 (Claim Nos. 4 & 81), and there appear to be a number of other claims filed by former employees of the Debtor, *see, e.g.*, Trustee Ex. 15 (Claim Nos. 1, 2, 3, 5, 6, 7, 17, 19, & 20).  However, some of those employee claims may be priority claims and, if so, they will be paid prior to distributions to unsecured creditors.  To the extent any of these employees assert unsecured claims against the Debtor, the Court currently sees no reason why they should be treated better than Canada.

[19] Moreover, it appears that the estate may have claims against certain of the Kornman-affiliated creditors.  If so, and if those claims are successfully prosecuted, the Kornman-affiliated claimants may not be legally entitled to participate in distributions from the estate.  *See* 11 U.S.C. § 502(d).

---

arbitrators found that he agreed to pay Canada the Extra Services Component of the Canada Claim. After losing in the Arbitration, Kornman should not be given another opportunity to limit Canada's compensation under the guise of § 502(b)(4) when third party creditors are not benefited by that limitation.[20]

Second, assuming the Objectors' objections to the client claims are overruled in whole or in part, and the clients are determined to hold allowable claims in some amount against the Debtor, the Bankruptcy Code provides another mechanism to address any unfairness to those creditors from Canada's participation in distributions as an unsecured creditor – *i.e.*, § 510(c) of the Bankruptcy Code. Generally, § 510(c) allows the Court to "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim . . . ." 11 U.S.C. § 510 (c). Although the United States Supreme Court has not expressly held that a bankruptcy court must always find creditor misconduct before subordinating a claim, it has stated that "the circumstances that prompt a court to order equitable subordination must not occur at the level of policy choice at which Congress itself operated in drafting the Code." *U.S. v. Noland*, 517 U.S. 535, 543 (1996). The Fifth Circuit has noted that equitable subordination under § 510(c) is "rarely granted unless three conditions are satisfied: (1) when the claimant engaged in inequitable conduct; (2) the conduct resulted in harm to the creditors or conferred an unfair advantage upon the claimant; and (3) equitable subordination is not inconsistent with the Bankruptcy Code." *Carrieri v.*

---

[20] It appears that this dispute over the reasonableness of the Extra Services Component of the Canada Claim is little more than a continuation of the State Court Lawsuit and the Arbitration, and that there are extremely hard feelings between Kornman and Canada surrounding the cessation of Canada's employment with the Debtor. From the Court's perspective, it appears that Kornman was the driving force behind the continued objections to the Canada Claim. While the Trustee filed the Trustee Joinder, he waited to do so for almost a year after his appointment, and did not present any expert testimony supporting his Joinder, relying instead on the expert witnesses called by the Kornman objectors.

*Jobs.com, Inc.*, 393 F.3d 508, 527, n.19 (5th Cir. 2004). Therefore, the Bankruptcy Code provides a potential remedy if the Court concludes, after further proceedings, that the claims of other unsecured, non-insider creditors should be paid before the Canada Claim is paid.

In concluding that the Extra Services Component of the Canada Claim represents reasonable compensation in relation to the services provided by Canada in connection with the Connecticut Client engagement, the Court has considered, and rejected, the expert testimony offered by the Objectors. This is so for several reasons. First, as an analytical matter, the Court concludes that the experts' analyses were flawed, as no expert distinguished between the Extra Services Component of the Canada Claim (which is subject to § 502(b)(4)'s reasonableness requirement) and the Interest Component of the Canada Claim (which is not subject to § 502(b)(4)'s reasonableness requirement). Stated another way, in coming to his opinion, no expert focused solely on the Extra Services Component of the Canada Claim and explained why it failed to represent reasonable compensation for the services Canada provided on the Connecticut Client engagement. While that conclusion is implicit in each expert's opinion (because each concluded that Canada had already received adequate compensation in connection with the Connecticut Client engagement), the expert's analytical approach was flawed nevertheless.

Second, two of the Objectors' experts, Alan Johnson and Professor Frank Portnoy, analogized the Debtor to an investment bank and then compared the Extra Compensation Amount to what an employee of an investment bank might have expected to receive in connection with a joint sales effort on a client matter. In concluding that

Canada had already received adequate compensation from the Debtor,[21] those experts characterized Canada as something other than a top producer at an investment bank. While Johnson did not specifically identify his placement of Canada within an investment banking hierarchy, Professor Portnoy characterized him as a mid-level executive, 10/12 Tr. at 194, 22-25, – *i.e.*, a principal/director, 10/12 Tr. at 195, 9-14, as opposed to a managing director or a senior managing director. Even assuming an investment bank is an appropriate analogy to the Debtor, the Court disagrees with Canada's placement at the director/principal level or as something less than a top producer. Here, Canada was the Debtor's number two principal and, by 2000, was clearly a top producer for the Debtor.[22]

----

[21] Johnson testified that at an investment bank, a total 10-15% commission would be split between (1) the parties who "generated" the client, and (2) the three Debtor principals involved in the transaction – *i.e.*, Kornman, Canada, and Bird. However, this analysis is flawed when applied to the Debtor because the Debtor's research department, initiators, and contractors were never compensated so handsomely in the Debtor's hierarchy. And, while those parties played a role in identifying the Connecticut Client and in introducing the Connecticut Client to the Debtor's business, it was an inconsequential role in truly "generating" the client. Based upon the evidence offered at trial, the Court finds that the Debtor's three principals "generated" the Connecticut Client. The Court comes to this conclusion because without the three principals' efforts, the Connecticut Client would not have signed with the Debtor, and no fees would have been realized.

Moreover, Johnson admitted that the Debtor's compensation agreement with Canada was "probably reasonable for small and medium sized cases." 10/11 Tr. at 190, 1-2. However, no principled reason was offered for it being unreasonable in connection with larger cases.

[22] Professor Portnoy also identified a number of factors he believed to be relevant in determining compensation on a given transaction in investment banks. According to Porfessor Portnoy, investment banks "look at the role that the person plays in the transaction . . . [t]hey think about the seniority of the individual, how are they a team player, how have they participated in other transactions, what is their potential for leadership at the bank, did they bring in the client, are they actually responsible for the initial client [contact]." 10/12 Tr. at 184, 2-16. When those factors are applied here, the Court concludes that Canada is entitled to receive the Extra Services Component of the Canada Claim. For example, prior to Canada's involvement, Kornman did not think the Connecticut Client would sign an agreement with the Debtor. But, with Canada's able assistance, the Connecticut Client did sign such an agreement. It seems, then, that Canada's role in procuring the Connecticut Client was significant. Moreover, Canada was quite senior in the Debtor's hierarchy – *i.e.*, the number two person, second only to Kornman. In addition, based upon the number of cases Canada handled jointly with Kornman and the testimony of Andrew Williams, the Court concludes that Canada was a team player and that he played a key management role at the Debtor. Williams was a "contractor" and the manager of the Debtor's inside marketing department or, as referred to herein, the "initiators." Williams described Canada as "the closer." 9/12 Tr. at 357, 16. *See generally*, 9/12 Tr. at 354, 5 - 359, 4; 375, 21 - 377, 14. Finally, while Canada was not responsible for the initial contact with the Connecticut Client, neither was any other principal of the Debtor. Rather, the Debtor's research department identified the Connecticut Client as a possible client, and then the initiators and contractors had the initial contacts with the Connecticut Client.

Moreover, Johnson admitted that while high, a more senior person within an investment bank could have received compensation at the Extra Services Component level on a transaction generating $29 million in fees. 10/11 Tr. at 196, 8-16.[23]

Third, another of the Objector's experts, Al Lannom, compared Canada's compensation to that of the senior executives at 22 "guideline" public companies and, based upon that comparison, concluded that any additional compensation to Canada would be unreasonable. While there are several issues surrounding the integrity of Lannom's analysis,[24] even assuming that his 22 "guideline" companies are the appropriate comparables,[25] Lannom's analysis fails to take the nature of Canada's role at Heritage into account. In short, while Canada was President of the Debtor, as relevant here, he was essentially a commissioned salesman for the Debtor, selling tax savings strategies to extremely wealthy clients. And, while Canada's compensation was not solely commission-based – i.e., he received a guaranteed draw of $500,000, by 2000 and 2001, Canada was earning commissions far in excess of his $500,000 draw. Moreover, Lannom admitted that he was unaware of the extent to which any of the executives at his

---

[23] While Professor Portnoy disagreed, the basis for his disagreement stems, at least in part, from the flawed approach of looking at the Extra Compensation Amount as a whole, as opposed to looking at its component parts. Specifically, Professor Portnoy testified that he could "not imagine that someone who generated $25 million in revenue for an investment bank would receive a $5 million bonus. In my opinion that would be unheard of. I was involved in transactions that generated revenue approaching that and wasn't paid anything close to $5 million." 10/12 Tr. at 223, 9-14. However, there are at least three significant distinctions: (i) the Extra Services Component was not $5 million – it was $3.4 million, (ii) the Debtor was a small private company where compensation for all employees was fixed by a single individual, not a public company, and (iii) Professor Portnoy spent 2 years at CS First Boston and Morgan Stanley & Co in New York City as an associate following his judicial clerkship, 10/12 Tr. at 212, 8-23; he was not the number two person at either investment bank.

[24] For example, Lannom stated that reasonable compensation to executives must be considered in comparison to the return on equity. However, when computing the Debtor's return on equity, Lannom focused on the return to 8% of Heritage's investors, not the 92% owned by the Kornman-affiliated entities. And, on cross-examination, the flaws in Lannom's computation of the so-called return on equity were revealed.

[25] Lannom described these companies as "largely not similar [to the Debtor] . . . as a group they're not similar, but they're comparable." 10/12 Tr. at 92, 1-3 & 18-25. The Court continues to be unclear about the distinction Lannom was attempting to draw. It is hard to imagine "not similar" companies being "comparable."

---

**Memorandum Opinion and Order**                                                                 25

"guideline companies" were also commissioned salesmen. 10/12 Tr. at 113, 13-19. Finally, Lannom essentially admitted that if the Court concluded that Canada was acting as a salesman in connection with the Connecticut Client engagement, it would affect the value of his expert analysis. 10/12 Tr. at 102, 23 – 103, 2.

In sum, none of the Objectors' experts offered testimony that was ultimately persuasive to the Court in connection with its analysis of the reasonableness of the Extra Services Component of the Canada Claim.

### C.     Setoff Amounts

Having determined that no portion of the Canada Claim is objectionable under § 502(b)(4), the Court must now determine the extent to which the Debtor is entitled to setoff any amounts owed to it against the Canada Claim. Pursuant to the Arbitration Award, the arbitrators denied the Debtor's counterclaim for attorneys' fees and expenses. *See* Trustee Ex. 2. However, as explained in the Prior Order, this Court previously concluded that the arbitrators exceeded their arbitral authority in so ruling.[26] *See* Prior Order at pp. 18-20.

Pursuant to § 10.8 of the Employment Agreement, Canada agreed to pay "all legal fees and other expenses incurred by or on behalf of [the Debtor] relating to, or in connection with, enforcing this Agreement or in defending any action by [Canada] to enforce this Agreement, regardless of which party ultimately prevails in said action." Trustee Ex. 3 at § 10.8. Pursuant to this provision, and given the nature of Canada's

---

[26] Notwithstanding this prior ruling, Canada contends that the Court should reconsider the Prior Order, and enforce the Arbitration Award as entered by the arbitrators, thereby denying the recovery of attorneys' fees and expenses by the Debtor (and allowing the arbitrators' unequal division of arbitration costs and expenses). Judge Felsenthal carefully considered Canada's contentions regarding the enforceability of the Arbitration Award prior to issuing the Prior Order and rejected those contentions. The undersigned judge declines to revisit those issues here.

claims against Kornman – *i.e.*, that Kornman was personally liable for Canada's claims as an "Affiliate" of the Debtor under the Employment Agreement, both the Debtor's attorneys' fees and expenses and Kornman's attorneys' fees and expenses must be considered in determining the amount of attorneys' fees and expenses which should have been awarded to the Debtor in the Arbitration. This is so because under the Debtor's governance documents, the Debtor agreed to indemnify Kornman from claims asserted against him as an officer of the Debtor. *See* Canada Ex. 34 at § 8.01. Accordingly, the Debtor paid the fees and expenses incurred by Kornman in defending against Canada's claims in the Arbitration. And, under the Employment Agreement, Canada agreed to reimburse the Debtor for those fees and expenses. Therefore, in accordance with the Prior Order, the Court will award fees and expenses incurred by the Debtor's counsel and Kornman's counsel in connection with the Arbitration.

The date through which such attorneys' fees and expenses must be determined is April 14, 2004, the date the Arbitration Award was issued. Although there were several post-award motions filed in the State Court Lawsuit that were removed to this Court once the Bankruptcy Case was filed, the motions properly before Judge Felsenthal, which resulted in the Prior Order, all related to efforts to either confirm or vacate the Arbitration Award. Judge Felsenthal entered the Prior Order disposing of those motions, and considered only the extent to which attorneys' fees and expenses should have been awarded in the Arbitration Award. None of the motions disposed of in the Prior Order sought a recovery of attorneys' fees and expenses beyond those incurred to the date of the Arbitration Award, April 14, 2004. *See* Docket Nos. 4, 7, 19, and 20.

In the Prior Order, Judge Felsenthal ruled that the Court would conduct a further hearing regarding the determination of the amount of attorneys' fees and expenses to be awarded to the Debtor in light of his vacatur of that portion of the Arbitration Award, following which "the trustee shall have a judgment for recovery of attorney's fees." *See Prior Order*, at p. 26. That hearing has now been held, and this Court is, in essence, ruling upon the portions of the various motions to vacate or confirm the Arbitration Award that remained after entry of the Prior Order. Although the continuation of the State Court Lawsuit, and then this action upon removal, related to both the Debtor's defense of an action by Canada (*i.e.*, Canada's contention that the arbitration award was legally confirmable) and an action by the Debtor to enforce the Employment Agreement (*i.e.*, the Debtor seeking to recover the attorneys' fees it had paid from Canada), a request for attorneys' fees and expenses beyond those sought in the Arbitration is not properly before the Court at this time. Accordingly, the Debtor is entitled to recover all legal fees and other expenses incurred by, or on its behalf, through April 14, 2004, without prejudice to any further request for the recovery of attorneys' fees and expenses incurred in connection with enforcing the Employment Agreement or in defending against Canada's attempts to enforce the Employment Agreement after April 14, 2004.[27]

The Debtor (and now, the Trustee) seeks to recover attorneys' fees and expenses incurred by the following law firms: Lynn Tillotson & Pinker, L.L.P. (the "Lynn Firm"), for its representation of the Debtor in the Arbitration; Munsch Hardt Kopf & Harr, P.C. (the "Munsch Firm"), for its representation of the Trustee after his appointment in the

---

[27] However, the fees and expenses incurred in connection with the Claim Objection are not recoverable by any of the Objectors because those fees and expenses do not relate to the enforcement of the Employment Agreement or the defense of any action by Canada to enforce the Employment Agreement. Rather, those fees and expenses relate to the Objectors' contentions that the Extra Compensation Amount of the Canada Claim is not allowable in the Bankruptcy Case under § 502(b)(4) of the Bankruptcy Code.

Bankruptcy Case; Forshey & Prostok, L.L. P. (the "Forshey Firm"), for its representation of GMK Holdings in the Bankruptcy Case; Baker & McKenzie, L.L.P. (the "Baker Firm"), for its representation of the Debtor in the Bankruptcy Case; Hill Gilstrap, P.C. (the "Hill Firm"), for its representation of GMK Holdings in this adversary proceeding; and Susman Godfrey L.L.P. (the "Susman Firm"), for its representation of Kornman in the Arbitration.

The Court concludes that Canada is not required to pay the attorneys' fees and expenses incurred by either the Forshey Firm or the Hill Firm. GMK Holdings, which those firms represented at various points in time, was not a party to the Employment Agreement and was not a party to the Arbitration. None of the fees and expenses incurred by those firms were fees and expenses "incurred by or on behalf of [the Debtor] relating to, or in connection with, enforcing [the Employment Agreement] or in defending any action by [Canada] to enforce" the Employment Agreement. Trustee Ex. 3 at § 10.8. Although GMK Holdings joined in several motions related to efforts to confirm or vacate the Arbitration Award, it did so as a volunteer. Moreover, as noted previously, the fees and expenses incurred in connection with the Claim Objection are not recoverable under the Employment Agreement. *See supra*, n. 27.

Similarly, Canada is not required, at this time, to pay attorneys' fees and expenses incurred by the Baker Firm, for its representation of the Debtor in the Bankruptcy Case, or the Munsch Firm, for its representation of the Trustee, as all of those fees and expenses were incurred after April 14, 2004, the date of the Arbitration Award.

Through April 14, 2004, the Debtor initially claimed it had incurred $937,623.00 in attorneys' fees and $69,502.90 in expenses owed to the Lynn Firm in connection with

the Arbitration.  *See* Trustee Ex. 5.  However, on November 18, 2005, after the

conclusion of the evidence, the Lynn Firm filed a supplemental affidavit, *see* Docket No.

177, in which the Lynn Firm deducted certain fees and expenses which Mr. Tillotson had

conceded on cross-examination during the trial were either duplicative, or which were

properly attributable to a separate lawsuit, and not to the Arbitration.  As a result, the

Debtor now seeks to recover from Canada attorneys' fees of $932,341.00 and expenses of

$63,869.57 through April 14, 2004.

Some of those fees and expenses were incurred in connection with the State Court

Lawsuit, in which the Debtor challenged one of Canada's proposed arbitrators and

Canada objected to one of the Debtor's proposed arbitrators, which challenge the Debtor

defended.  *See* Docket No. 177, p. 3-5.  Canada contends that none of the fees and

expenses incurred by the Debtor and Kornman in connection with the State Court

Lawsuit should be awarded, because those proceedings related, among other things, to

procedural efforts to select or disqualify certain proposed members of the Arbitration

panel, and the Debtor and Kornman were unsuccessful in many of their efforts.

The Court disagrees.  Section 11.3 of the Employment Agreement provided that

all arbitrators selected must be "Authorized Arbitrators."  *See* Trustee Ex. 3.  Section

1.2(c) of the Employment Agreement sets forth very detailed requirements in order for a

person to be considered an "Authorized Arbitrator."   Notwithstanding the binding

arbitration clause in the Employment Agreement, the Employment Agreement also gave

the Debtor the ability to obtain relief from any court of competent jurisdiction where

necessary to prevent violations of the Agreement and to effectuate the purposes of the

arbitration provision.  *See* Trustee Ex. 3, § 11.2.  Canada conceded at oral argument that

the Debtor had the right to go to state court if they were "unhappy with, procedurally, how the arbitration mechanics were progressing." 11/9 Tr. at 243, 11-18. Accordingly, the Debtor acted within its contractual rights in going to state court to challenge Canada's proposed arbitrators. The Court agrees with the Debtor's contention that the time billed by the Lynn Firm in connection with these matters was "worked performed . . . in connection with the selection of the arbitrators to hear the Canada arbitration and was based on enforcing the terms of Mr. Canada's Employment Agreement and its terms regarding the arbitration," *see* Docket No. 177, p. 5, and therefore is recoverable. *See* 11/9 Tr. at 148, 19-25 ("the state court lawsuit only related to the arbitration. It was a vehicle to force certain things to happen in the arbitration proceedings . . . so it's a state court lawsuit, but it was an effort to effectuate the arbitration rights between the parties").

However, the Court agrees with Canada's further contention that § 10.8 of the Employment Agreement is subject to Rule 1.04 of the Texas Disciplinary Rules of Professional Conduct, *see* 11/9 Tr. at 143, 17-20, which provides that "[a] lawyer shall not enter into an arrangement for, charge, or collect an illegal fee or unconscionable fee. A fee is unconscionable if a competent lawyer could not form a reasonable belief that the fee is reasonable." Tx. Gov't Code Ann. Ch. 84 App., Art. 9, Rule 1.04 (Vernon 2005). One of the factors to consider in determining the reasonableness of the fee is the "results obtained." *Id*.

The Court has reviewed the Lynn Firm's time sheets, and finds that $184,276.50 of fees were initially claimed in connection with the State Court Lawsuit. Of the $184,276.50 initially claimed, Mr. Tillotson conceded on cross-examination that several of the entries were erroneously charged to the State Court Lawsuit file. *See, e.g.*, Entry

dated 12/18/02, BYG, for 1 hour in filing a second amended petition and attending a status hearing (11/9 Tr. 144, 9-15); Entry dated 11/12/03, MPL, for 8.0 hours in attending a mediation (11/9 Tr. 184, 4-11); Entry dated 10/13/03, ARR, for .8 hours in reviewing "rule 202 petitions" (11/9 Tr. 181, 10-15).   The erroneous entries total $1,052.00.[28] Those fees must be disallowed in this context, leaving fees of $183,224.50 in connection with the State Court Lawsuit.

However, further reductions are appropriate based upon the "results obtained" in the State Court Lawsuit.   For example, the Debtor sought a TRO in the State Court Lawsuit, but none was ever entered.   11/9 Tr. 142, 11-18.   The Debtor requested further injunctive relief, which was also denied.   11/9 Tr. 153, 21-154, 8.   Moreover, the Lynn Firm incurred fees in attempting to add the American Arbitration Association as a party to the State Court Lawsuit, but no relief was ever granted as against that entity.   11/9 Tr. 156, 8 – 157, 9.

After considering these and other issues, the Court concludes that a 10% reduction of fees incurred in connection with the State Court Lawsuit is appropriate. Accordingly, a further reduction of $18,322.45 in fees is required.   Therefore, through April 14, 2004, the total amount of attorneys' fees reasonably incurred by or on behalf of the Debtor for the Lynn Firm in enforcing the Employment Agreement or in defending against Canada's claims was $912,966.55 ($932,341.00 - $1,052 (erroneous entries) - $18,322.45 (results obtained reduction)), plus expenses of $63,869.57.

---

[28]   The Court believes that the failure to "back out" the fees associated with these time entries in the Lynn Firm's supplemental affidavit was a result of oversight.

In addition, Kornman incurred $186,616.25 in attorneys' fees and $2,104.68 in expenses[29] (paid to the Susman Firm by the Debtor) in connection with the Arbitration through that same date. *See* Trustee Ex. 6. Pursuant to a procedure agreed to by the parties during the trial, the Susman Firm filed an affidavit in support of its fees and expenses, but did not testify at trial. Canada requested, by letter, further clarification as to certain entries to which he objected, and the Susman Firm filed a supplemental affidavit responding to those inquiries. Canada then filed "Comments and Objections" to the supplemental affidavit, in lieu of cross-examination. *See* Docket No. 180. The Court has considered each of these pleadings in evaluating the Susman Firm's fees and expenses.

Canada continues to object to the Susman Firm's fees on several grounds. First, Canada asserts that the Susman Firm admits in paragraph 3 of its original affidavit that the invoices are "in connection with and related to the Debtor's dispute of Canada's claims or the related claims by Anthony Bird." *See* Aff. of Terrell Oxford, ¶ 3. Canada argues that despite having requested that the Susman Firm segregate the fees related to the Anthony Bird matter, the Susman Firm's supplemental affidavit appears to contradict paragraph 3 of its original submission by stating that *all* fees submitted on its invoices were only for the Canada Arbitration. Accordingly, Canada objects to *all* of the Susman Firm's fees. In addition, Canada points out that the Susman Firm admits using one "matter number" to identify tasks performed for *both* arbitration proceedings, before they were bifurcated. To the extent the Court permits recovery of any fees, Canada objects to $17,552.07 of the fees, which represents half of the fees that were assigned to matter

---

[29] The invoices annexed to Docket No. 168 show expenses totaling $2,219.50. In a supplemental affidavit, however, the Susman Firm states that it has been paid $2,104.68 in expenses. *See* Docket No. 179.

number "006033." Canada further objects to $3,595.00 of fees incurred by M.P. Fritz as being duplicative. Although the supplemental affidavit denies that the entries are duplicative, Canada points out that an examination of the time entries themselves shows a virtually identical description of tasks performed on the same day, by the same professional, without adequate explanation. To the extent the time entries are not duplicative, Canada asserts that the time expended in those entries is excessive. Further, if the Court agrees that the fees assigned to matter number 006033 should be reduced, Canada admits that the reduction for Mr. Fritz's entries should only be reduced by $2,297, "since a portion of such duplicative or excessive entries would have already been reduced by the Bird adjustment." *See* Docket No. 180, ¶ 4. Lastly, Canada objects to all fees attributable to "K. Hulburt" for "reviewing incoming correspondence" and the like as being clerical in nature, and not properly billable at paraprofessional rates, and requests a further reduction of $2,543.75.

The Court finds many of Canada's objections to be well-taken. First, the Court agrees that with respect to "matter number 006033," the Susman Firm has not adequately segregated its fees attributable solely to the Canada matter, as the time entries contain, by admission, time related to the arbitration with Anthony Bird. Therefore, the Court sustains Canada's alternate objection on this ground, and finds that the Susman Firm has not met its burden to show that all of those fees are related to the Arbitration. The Court will therefore not award $17,552.07 of the fees sought, which sum represents half of the fees assigned to "matter number 006033." The Court also agrees that some of the entries do, in fact, appear duplicative. For example, M.P. Fritz billed 2.00 hours on January 2, 2003, for "Reviewing brief regarding state court dismissal of Bird's claims. Preparing

letter to L. Matz, clerk requesting record. Researching points of law regarding request of record in 5th District." The *identical* time description appears on another entry for M.P. Fritz, on that same date, for one hour. *See* Trustee Ex. 6, p. TEE-C000452. The Court will sustain Canada's objection on this ground, and will reduce what appear to be duplicative fees of $2,050.00.[30] Further, the Court agrees that $2,543.75 of the fees related to time entries by "K. Hulburt" are for services which are ministerial or clerical in nature, which should not be billed at a rate of $100/hour. Rather, the Court will permit those 25.43 hours at a rate of $60/hour, for a total of $1,525.80, resulting in a reduction of fees of $1,017.95 ($2,543.75 − $1,525.80).

With respect to Canada's general objection that paragraph 3 of the original Susman Firm affidavit states that some of the invoices are in connection with and related to the Debtor's dispute of Canada's claims or the related claims by Anthony Bird, the Court believes that in light of the Susman Firm's supplemental affidavit and in light of the Court's prior reductions of time entries assigned to "matter number 006033," the objection should be overruled. Accordingly, the Court finds that the fees of the Susman Firm should be recovered in the sum of $165,996.23 ($186,616.25 - $17,552.07 - $2,050 - $1,017.95), plus expenses in the amount of $2,104.68.

Therefore, through April 14, 2004, the total amount of attorneys' fees and expenses incurred by or on behalf of the Debtor in enforcing the Employment Agreement or in defending against Canada's claims was $1,144,937.03 (the "Fees Setoff Amount"). The Canada Claim is subject to setoff by the Fees Setoff Amount.

---

[30] *See* Trustee Ex. 6, time entries dated 1/2/03, 1/7/03, 1/15/03, 1/27/03, 1/30/03, 2/7/03, 2/10/03, 2/12/03, 2/14/03, 2/17/03, and 1/27/04. Of those entries, the first 5 were previously reduced as being assigned to "matter number 006033". Therefore, the Court will not permit recovery of $2,050 in duplicative time entries (those not already reduced as a result of the "Bird adjustment").

With respect to the costs and expenses of the Arbitration, Canada and the Debtor contractually agreed in the Employment Agreement that all costs and expenses of the arbitrators would be split evenly between them.  *See* Trustee Ex. 3 at § 11.4.  As explained in the Prior Order, the arbitrators exceeded their arbitral authority in assessing more than half of these costs and expenses against the Debtor.  *See* Prior Order at p. 21.

As evidenced by the Arbitration Award, the total amount of the costs and expenses assessed in the Arbitration was $207,169.49.  *See* Trustee Exs. 2 (p. 2), 10. Accordingly, Canada's share of the arbitration costs was $103,584.74.  As reflected in the Arbitration Award, Canada advanced $79,994.49 towards his share of the arbitration costs in connection with the Arbitration, leaving a balance of $23,590.25.  *See* Trustee Exs. 2 (p. 2), 10.  The Debtor paid both its share of the arbitration costs, $103,584.75, and the balance of Canada's share, $23,590.25.  *See* Trustee Ex. 10.  Consequently, the Debtor's estate is entitled to reimbursement of $23,590.25 from Canada in the form of a setoff against the Canada Claim (the "Arbitration Costs Setoff Amount").

## V.    Conclusion

The Claim Objection, the Debtor's Joinder, and the Trustee's Joinder are overruled.[31]  The Extra Services Component of the Canada Claim represents reasonable compensation to Canada for the services he provided to the Debtor in connection with the Connecticut Client.  Accordingly, the Canada Claim, reduced by the Fees Setoff Amount and the Arbitration Costs Setoff Amount, shall be allowed in the Bankruptcy Case, subject to any party's request, if any, for the recovery of attorneys' fees and/or expenses beyond April 14, 2004.

---

[31] The only objections remaining after entry of the Prior Order are those under § 502(b)(4).

**SO ORDERED**.

# # # END OF ORDER  # # #